IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

LRY, LLC; FR, LLC,

          Plaintiffs,

v.

LAKE COUNTY; BRUCE ADDINGTON; CORNERSTONE INDUSTRIAL MINERALS CORPORATION, U.S.A.,

          Defendants.

Civ. No. 1:17-cv-00675-MC

**OPINION & ORDER**

McSHANE, District Judge.

This matter comes before the Court on a Motion to Dismiss filed by Defendant Bruce Addington and Defendant Cornerstone Industrial Minerals Corporation (collectively, "Cornerstone Defendants"). ECF No. 80. Cornerstone Defendants also urge the Court to decline the exercise of supplemental jurisdiction over Plaintiffs' state law claims. Finally, Cornerstone Defendants move to strike certain factual allegations from the Third Amended Complaint. For the reasons discussed below, the motions are DENIED.

## BACKGROUND

The following factual summary is taken from the Third Amended Complaint ("TAC"). ECF No. 66.

Plaintiff LRY, LLC ("LRY") is an Oregon limited liability company with its principal place of business in Lakeview, Oregon. LRY operated a local railroad line connecting Lakeview, Oregon and Perez, California. As part of its operations, LRY leased approximately 55 miles of railway track from Defendant Lake County, Oregon ("the County"). A further section of track in Northern California was leased from Union Pacific Railroad Company. The leased section located in Oregon was known as the Lakeview Branch and the agreement between LRY and the County was memorialized in the Lake County Lease and Operating Agreement (the "Lease"), which was signed by LRY and the County on November 3, 2010. During the negotiation and drafting of the Lease, LRY was represented by attorney John D. Heffner ("Heffner") and his associates.

The Surface Transportation Board ("STB") is a federal agency with regulatory authority over railroads. The STB granted LRY an exemption to operate the Lakeview Branch pursuant to the Lease. Heffner also represented LRY in seeking STB approval.

The Lakeview Branch was generally in poor condition and there were a number of disputes between LRY and the County over the cost of necessary repairs. The State of Oregon offered grants through a program called *Connect*Oregon, which would help to defray the cost of those repairs. LRY, with the assistance of the County, applied for and received four *Connect*Oregon grants totaling more than $2 million for the improvement of the Lakeview Branch. In order to qualify for the *Connect*Oregon grants, LRY and the County agreed to extend the period of the Lease through December 31, 2035.

The *Connect*Oregon grants were provided with a requirement that the recipient pay a percentage of matching funds for the project. The County has provided the matching funds for two of the four grants, but LRY was required to pay $140,000 to match funds for one of the

remaining grants. In addition to those funds, Plaintiff FR, LLC ("FR") has loaned more than $500,000 to LRY to finance additional repairs, with the expectation that it would recoup the loaned funds over the life of the Lease.

LRY served a number of industrial clients in Lake County, including Defendant Cornerstone Industrial Minerals Corporation ("Cornerstone"), which operates a perlite mine. Defendant Bruce Addington ("Addington") is the owner and president of Cornerstone. Cornerstone Defendants were unsatisfied with LRY's rates and other aspects of LRY's service.

In 2016, LRY secured contractual rights to handle traffic for a new industrial client, Red Rock Biofuels. The Red Rock contract was expected to return annual profits of $400,000 for LRY. In November 2016, the County sent a letter to LRY demanding a copy of LRY's contract with Red Rock Biofuels.

In late 2016 through early 2017, Cornerstone Defendants and the County retained a consulting firm to carry out an inspection of the Lakeview Branch and LRY's operations, without LRY's involvement. Also in late 2016, Cornerstone Defendants retained Heffner as their attorney. As discussed above, Heffner had previously represented LRY and was responsible for the negotiation and drafting of the Lease between LRY and the County. In January 2017, Heffner, acting on behalf of Cornerstone Defendants, corresponded with the County's attorney concerning interpretation of the Lease and how an ambiguity in the Lease could be used to LRY's detriment. In April 2017, Heffner contacted the County's attorney several more times on behalf of Cornerstone Defendants. These emails communicated Cornerstone Defendants' dissatisfaction with LRY's operations and advised the County on how to most efficiently proceed with terminating the Lease.

Heffner did not inform LRY that he was now representing a party adverse to LRY's interests, nor did Heffner seek informed written consent from LRY.

On April 12, 2017, the County sent LRY a letter terminating the Lease without cause, effective April 30, 2017. At the time of the termination, LRY had invested a considerable sum in ballast and railroad ties for use in upgrading and repairing the Lakeview Branch. These materials, and all other LRY property, had to be relocated at a cost of more than $150,000. Additionally, federal regulations require that interstate railroads operate continually. In order to prevent a stoppage of interstate commerce, LRY was forced to continue operating the Lakeview Branch at its expense until a new carrier was approved by the STB.

Shortly after the termination of the Lease, Heffner, again acting on behalf of Cornerstone Defendants, advised the County's attorney that the County "has the ability to provide service in its own right so it could subcontract to Bruce [Addington] as of May 1, [2017]. That might simplify things."

On June 22, 2017, Goose Lake Railway ("Goose Lake") submitted a proposal to take over operating the Lakeview Branch from LRY. Goose Lake is owned by Addington and non-party Toby Van Altvorst. Addington is also the president of Goose Lake. On July 27, 2017, Addington wrote to the County to urge the County to move more quickly in finding a replacement for LRY, saying "Please hurry! This is painful." The County ultimately did select Goose Lake as LRY's successor in operating the Lakeview Branch. LRY alleges that the County and Cornerstone Defendants will benefit from FR and LRY's investments in the Lakeview Branch, as well as in taking over the Red Rock contract.

## LEGAL STANDARD

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). A court may grant a motion to dismiss for failure to state a claim only when there is no cognizable legal theory to support the stated claim, or when the complaint does not allege enough facts to support a facially plausible claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In considering whether the complaint is sufficient, the court will take as true all material factual allegations and construe them in the light most favorable to the plaintiff. *NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986). The court must draw all reasonable inferences from the factual allegations in the plaintiff's favor. *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not credit legal conclusions or "threadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

## DISCUSSION

With respect to Cornerstone Defendants, Plaintiffs assert Oregon state law claims for unjust enrichment; tortious interference with business relationships or expectations; tortious interference with contracts; tortious interference with economic relations; and intentional interference with prospective economic advantage.[1] Cornerstone Defendants move to dismiss for failure to state a claim. Cornerstone Defendants also urge the Court to decline the exercise of supplemental jurisdiction over the state law claims. Finally, Cornerstone Defendants move to strike Plaintiffs' allegations concerning the actions of Heffner, who served as attorney to both LRY and Cornerstone Defendants.

---

[1] These claims are also asserted as to the County, along with other state and federal claims directed solely at the County.

## I. Failure to State a Claim

### A. The "Interference" Claims

Plaintiffs bring a battery of "interference" claims against Cornerstone Defendants for their role in the termination of the Lease. In terms of necessary elements, the interference claims are closely related.

Intentional interference with economic relations requires a plaintiff to allege (1) the existence of a valid business relationship or expectancy; (2) intentional interference with that relationship; (3) by a third party; (4) accomplished through improper means or for an improper purpose; (5) a causal effect between the interference and damage to economic relations; and (6) damages. *Uptown Heights Assocs. Ltd. P'ship v. Seafirst Corp.*, 320 Or. 638, 651 (1995). In *McGanty v. Staudenraus*, 321 Or. 532 (1995), the Oregon Supreme Court applied the same set of elements and further clarified that the first element, the existence of a valid business relationship or expectancy, could include professional relationships, contracts, or "prospective economic advantage." *Id.* at 535.

In the present motion, Cornerstone Defendants challenge Plaintiffs' showing on the fourth element, which requires that the interference be accomplished through improper means or for an improper purpose.

> If liability is based on improper means, then the means must violate some objective, identifiable standard, such as a statute or other regulation, or a recognized rule of common law, or, perhaps, an established standard of a trade or profession. Examples of improper means include violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood. And, if liability is based on an improper motive or purpose, then the purpose must be to inflict injury on the plaintiff as such.

*Sharma v. Providence Health & Services-Oregon*, 289 Or. App. 644, 668 (2018) (internal quotation marks and citations omitted).

First, Cornerstone Defendants assert that Plaintiffs' allegations of improper means or improper purpose are conclusory. The portions of the TAC in which Plaintiffs spell out their various interference claims also incorporate the preceding paragraphs, which go far beyond "bare bones" recitations of the elements and cannot be said to be conclusory.

More substantively, Cornerstone Defendants challenge any showing of improper purpose on the basis that, as business competitors, they were privileged to interfere in Plaintiffs' business relationships and economic expectations. In *Douglas Medical Center, LLC v. Mercy Medical Center*, 203 Or. App. 619 (2006), the Oregon Court of Appeals held that there is no improper purpose in an interference claim if the relationship in question "concerns a matter involved in the competition between the actor and the other," and the defendant's "purpose is at least in part to advance his interest in competing with the other." *Id.* at 631 (quoting *Restatement (Second) of Torts* § 768(1) (1974)).

Plaintiffs argue, with some merit, that the *Douglas Medical Center* decision is inapposite because Cornerstone Defendants were not competitors of LRY and could not, therefore, have been acting to further their competitive interests. With respect to Cornerstone, this issue is straightforward. Cornerstone operates a perlite mine and was not a "competitor" of Plaintiffs. Addington represents a more complex situation. As the owner and president of Cornerstone, he cannot be said to have been a competitor of LRY. But at some point, Addington undertook to form Goose Lake Railways and petitioned the County to make his new company LRY's successor in operating the Lakeview Branch. Whether Addington became a competitor of LRY and, if so, when he became a competitor will have to await a more developed factual record.

Even if Cornerstone Defendants were not LRY's competitors in the traditional sense, the pursuit of business or economic interest is a relevant consideration when it comes to improper

purpose. In *Top Serv. Body Shop, Inc. v. Allstate Ins. Co.*, 283 Or. 201 (1978), the Oregon Supreme Court affirmed the trial court's entry of judgment notwithstanding the verdict on an interference claim between an auto repair shop and an insurance company. *Id.* at 203. The insurance company had taken steps to direct its clients away from the plaintiff's shop as part of an ongoing business dispute between the two. *Id.* at 210-11. The Oregon Supreme Court found that the insurance company's acts "were wholly consistent with Allstate's pursuit of its own business purposes as it saw them and did not suffice to support an inference of the alleged improper purpose to injure Top Service." *Id.* at 212. The pursuit of business interests is not, however, a blanket protection against allegations of improper purpose. As Judge Papak recently observed, "where the parties to an intentional interference with economic relations claim are not business competitors, the improper purpose requirement is satisfied where the interfering party's motive is in part improper, without regard to whether that party's motive is, in addition, in part to advance that party's own business interests." *Thames v. City of Portland*, 3:16-CV-1634-PK, 2018 WL 2749630, at * 14 (D. Or. Mar. 6, 2018), *F&R adopted by* 2018 WL 2749570 (D. Or. June 7, 2018).

In this case, it is certainly possible that Cornerstone Defendants were, like the insurance company in *Top Service*, wholly motivated by the pursuit of their business interests as they saw them, rather than by a desire to injure Plaintiffs. Such a determination is, however, premature. It is worth noting that the decision in *Top Service* was reached after a full jury trial. In this case, discovery is still ongoing and the scope of the case has expanded considerably since LRY filed its original complaint. On a motion to dismiss, the Court is confined to the allegations contained in the TAC, read in the light most favorable to Plaintiffs. At this stage and on this record, the

Court concludes that Plaintiffs have adequately alleged that Cornerstone Defendants acted with an improper purpose.

Furthermore, the fourth element of an interference claim may be satisfied by a showing of improper purpose *or* improper means. *Uptown Heights*, 320 Or. at 651. One of the "improper means" attributed to Cornerstone Defendants concerns their use of Heffner as their attorney. Plaintiffs allege Cornerstone Defendants used Heffner to advise the County as to how the Lease might be interpreted against LRY's interests and how the Lease might be cancelled and Addington's Goose Lake Railway substituted as the new carrier on the Lakeview Branch. Cornerstone Defendants argue that their subsequent employment of Heffner, years after he was employed by LRY, does not meet the standard for "improper means," but the Court is not convinced. The examples listed by the Oregon Court of Appeals in *Sharma* are not and were not intended to be exhaustive. If Cornerstone Defendants did, as Plaintiffs allege, suborn LRY's attorney and use him against his former client, such an act would not be out of place among the examples listed in *Sharma*. It is only through the discovery process that Plaintiff learned that their attorney seems intent on subverting their interests in the contract he drafted for them.

Plaintiffs have certainly alleged sufficient facts to support their allegations of improper means with respect to Heffner. The TAC alleges that Heffner, acting on behalf of Cornerstone Defendants, supplied detailed instructions and analysis to the County concerning the interpretation and cancellation of the Lease. Although Cornerstone Defendants' briefing suggests that their decision to hire Heffner was an innocent coincidence, occurring years after LRY and Heffner parted ways, the TAC and the exhibits already submitted to this Court paint a different picture. Heffner's involvement with the drafting of the Lease is apparent on the face of

the document. He is identified by name in the Lease as counsel for LRY, which lends credence to Plaintiffs' allegations concerning Cornerstone Defendants' decision to retain Heffner.[2]

Plaintiffs also allege that Cornerstone Defendants conspired with the County to deprive Plaintiffs of their federal statutory and constitutional rights through the cancellation of the Lease. Although these allegations are somewhat less detailed than those concerning Cornerstone Defendants' employment of Heffner, they have been sufficiently and plausibly alleged. The Court concludes that, if proven, such a conspiracy would fall within the ambit of "improper means" described in *Sharma*.

This case has taken surprising turns in the months since it was filed and the Court would not presume to speculate as to what the full record will ultimately reveal. For the purposes of a motion to dismiss, however, the Court concludes that Plaintiffs have plausibly alleged both an improper means and an improper purpose in support of their "interference" claims and have supported those allegations with sufficient facts.

### B. Unjust Enrichment

Plaintiffs also bring a claim against Cornerstone Defendants for unjust enrichment. The law of unjust enrichment is undergoing a period of rapid expansion in Oregon. In *Larisa's Home Care, LLC v. Nichols-Shields*, 362 Or. 115, 127-131 (2017), the Oregon Supreme Court rejected the formulaic, three-step approach previously laid out for unjust enrichment claims in *Jaqua v. Nike, Inc.*, 125 Or. App. 294, 298 (1993), in favor of a case-by-case analysis.

Following *Larisa's Home Care*, courts are directed to "examine the established categories of unjust enrichment as reflected in Oregon case law and other authorities to

---

[2] The Lease has previously been submitted as an exhibit in this case and is referenced extensively in the TAC. In Section 27, all notices sent under the Lease are to be mailed to counsel for the signatories. Rossmiller Decl. Ex. 2, at 17. ECF No. 3-2. This includes "James H.M. Savage, Esq. of John D. Heffner PLLC." *Id.* On the final page of the original Lease, Savage has also signed for approval as to form on behalf of John D. Heffner, PLLC. *Id.* at 18.

determine whether any particular enrichment is unjust." *Larisa's Home Care*, 362 Or. at 132. Aside from Oregon's own case law, *Larisa's Home Care* identified the *Restatement (Third) of Restitution and Unjust Enrichment* (2011) as a proper authority when considering whether allegations of unjust enrichment fall within an established category. *Id.* at 133; *The Hoag Living Trust dated Feb. 4, 2013 v. Hoag*, 292 Or App. 34, 45 (2018). The Oregon Supreme Court also looked to appellate decisions from other states, noting cases from Mississippi, Vermont, and New Jersey. *Larisa's Home Care*, 362 Or. at 134. The Court must therefore examine Plaintiffs' claims and determine if they fall within an "established category" of unjust enrichment.

In this case, Plaintiffs allege that they have invested substantial sums into the improvement of the Lakeview Branch in the expectation that the revenues generated by the improved line will recoup their expenses. With the cancellation of the Lease, which Plaintiffs allege was caused by the tortious interference of Cornerstone Defendants, Plaintiffs have lost the chance to recoup their investment in the Lakeview Branch and the benefits of their improvements will instead accrue to Defendants.

Plaintiffs maintain that they have pleaded a claim for unjust enrichment under an established category, pointing to § 44 the *Restatement*, which provides:

> (1) A person who obtains a benefit by conscious interference with a claimant's legally protected interests (or in consequence of such interference by another) is liable in restitution as necessary to prevent unjust enrichment unless competing legal objectives make such liability inappropriate.
>
> (2) For purposes of subsection (1), interference with legally protected interests includes conduct that is tortious, or that violates another legal duty or prohibition (other than a duty imposed by contract), if the conduct constitutes an actionable wrong to the claimant.
>
> (3) Restitution by the rule of this section will be limited or denied
>
> > (a) if the court would refuse to enjoin the interference, assuming timely application and an absence of procedural or administrative obstacles;

> (b) to the extent it would result in an inappropriate windfall to the claimant or would otherwise be inequitable in a particular case;
>
> (c) if the benefit derived from the interference cannot be adequately measured; or
>
> (d) if allowance of the claim would conflict with liabilities or penalties for the interference provided by other law.

*Restatement (Third) of Restitution and Unjust Enrichment*, § 44 (2011).

"Conscious interference with property rights of any kind, with contractual expectations, or other interests to which the law of torts extends a similar protection, will support the claim of restitution described in [§ 44]." *Id.* at cmt. b. Claims under § 44 "appl[y] generally to interference with contract or with prospective economic advantage, to the extent that such interference is tortious under applicable law." *Id.*

Plaintiffs have alleged that Cornerstone Defendants interfered with the relationship between LRY and the County and Plaintiffs' claim for unjust enrichment stems from that tortious interference. Whether such a claim will be proven remains to be seen, but as currently pleaded, the claim falls with the scope of § 44 of the *Restatement*.

Cornerstone Defendants also argue that the County, as the owner of the Lakeview Branch, is the party that is ultimately enriched by the Plaintiff-funded improvements and that they have not acquired any benefit recoverable under a theory of unjust enrichment. With respect to Addington, the Court is not convinced. Addington's new company will operate on the improved Lakeview Branch and, through that company, Addington will enjoy the fruits of Plaintiffs' investment in the line. Cornerstone itself represents a less clear situation. As the operator of a perlite mine, it will not profit directly in the same manner as Addington. The

"benefit" at the heart of a claim for unjust enrichment is, however, an "inherent[ly] flexible" concept. *Restatement (Third) of Restituion* § 1 cmt. a.

> While the paradigm case of unjust enrichment is one in which the benefit of one side of the transaction corresponds to an observable loss on the other, the consecrated formula "at the expense of another" can also mean "in violation of the other's legally protected rights," without the need to show that the claimant has suffered a loss. . . . There are cases in which the essence of a plaintiff's right and remedy is reversal of a transfer, and thus a literal "restitution," without regard to whether the defendant has been enriched by the transfer in question. Conversely, there are cases in which the remedy for unjust enrichment gives the plaintiff something—typically, the defendant's wrongful gain—that the plaintiff did not previously possess.
>
> \* \* \*
>
> [A] claim for restitution or "disgorgement" of the profits of conscious wrongdoing normally incorporates as its predicate the substantive elements of a cause of action for tort or other breach of duty. . . . Ordinarily, a complaint that alleges profitable wrongdoing by the defendant states a claim for restitution of unjust enrichment as well as a claim for damages in tort, whether or not it employs language by which the claim to the defendant's profits would be described in this Restatement.

*Id.* at cmt. a, e(3) (internal citation omitted).

It is conceivable that Cornerstone would benefit from reduced rates and preferential treatment as a result of having Addington in control of the new carrier. The precise contours of such a benefit will have to await further factual development and the Court is prepared to revisit the question of unjust enrichment as it applies to Cornerstone Defendants in future motions. For purposes of this motion, however, the Court is satisfied that Plaintiffs have placed their claim within an "established category" of unjust enrichment as required by *Larisa's Home Care* and that they have adequately pleaded their claim as to Cornerstone Defendants. Accordingly, Cornerstone Defendants' motion is DENIED.

## II. Supplemental Jurisdiction

Plaintiffs' sole federal claim in this case lies against the County and all of Plaintiffs' claims against Cornerstone Defendants are derived from Oregon state law.[3] Federal courts are courts of limited jurisdiction. *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005). The federal court has supplemental jurisdiction over state law claims only when the plaintiff alleges a federal claim over which the court has original jurisdiction and the state law claims "are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). "Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties." *Id.* Under § 1367(c), the court may decline the exercise of supplemental jurisdiction if (1) the claim raises a novel or complex issue of state law; (2) the claim substantially predominates over the claim or claims over which the court has original jurisdiction; (3) the court has dismissed all claims over which it has original jurisdiction; or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. 28 U.S.C. § 1367(c).

Cornerstone Defendants urge the Court to decline the exercise of supplemental jurisdiction based on the fact that eighteen of Plaintiffs' nineteen claims are rooted in state law and that the state law claims therefore predominate over the federal claim. The Court is not convinced. The claims against Cornerstone Defendants are deeply intertwined with the allegations underpinning Plaintiffs' federal claim against the County, as required by § 1367(a). The mere fact that there are *more* state law claims than federal claims, or that Plaintiffs have not alleged a federal claim directly against Cornerstone Defendants is not enough to defeat

---

[3] Plaintiffs devote a considerable portion of their Response to a discussion of hypothetical federal claims against Cornerstone Defendants. Plaintiffs acknowledge that the TAC contains no such federal claims and so the Court declines to consider them.

supplemental jurisdiction. As noted above, § 1367(a) expressly contemplates supplemental jurisdiction over parties against whom no federal claim has been alleged. Accordingly, the Court concludes that the exercise of supplemental jurisdiction is appropriate in this case.

### III.  Motion to Strike

Finally, Cornerstone Defendants move to strike the allegations concerning Heffner, who, as previously discussed, served at different times as attorney to both LRY and Cornerstone Defendants. Cornerstone Defendants point out that the TAC contains no allegation that they knew of a duty owed by Heffner to LRY or that they caused Heffner to breach such a duty. Cornerstone Defendants maintain that the allegations concerning Heffner are therefore immaterial and/or impertinent to Plaintiffs' claims against Cornerstone Defendants.

Federal Rule of Civil Procedure 12(f) provides that courts "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter" on their own initiative or pursuant to a party's motion. Fed. R. Civ. P. 12(f). "Motions to strike are disfavored and infrequently granted." *Thames*, 2018 WL 2749630, at *3; *see also Bureerong v. Uvawas*, 922 F. Supp. 1450, 1478 (C.D. Cal. 1996) ("Rule 12(f) motions are generally disfavored because they are often used as delaying tactics and because of the limited importance of pleadings in federal practice.") (internal quotation marks and citation omitted). "Generally, 'motions to strike should be denied unless it can be shown that no evidence in support of the allegation would be admissible, or those issues could have no possible bearing on the issues in the litigation.'" *OHL N. Am. Transp. v. Chris Crossley's Trucking Adventures*, No. 3:12-CV-1130-AC, 2013 WL 1684103, at *2 (D. Or. April 17, 2013) (quoting *Gay-Straight Alliance Network v. Visalia Unified Sch. Dist.*, 262 F. Supp.2d 1088, 1099 (E.D. Cal. 2001)).

In this case, Cornerstone Defendants retained Heffner to advise them with respect to the Lease between LRY and the County. The factual allegations include the contents of a number of communications between the County and Heffner, who was acting on behalf of Cornerstone Defendants. As previously discussed, Heffner is named in the Lease itself. Plaintiffs are entitled to the reasonable inference that Heffner's prior representation of LRY was known, or became known, to Cornerstone Defendants when they retained him. That inference and the factual allegations supporting it are relevant to the questions of improper means and improper purpose at the heart of Plaintiffs' interference claims against Cornerstone Defendants. The allegations are neither immaterial nor impertinent and the motion to strike is DENIED.

## CONCLUSION

For the reasons discussed above, Cornerstone Defendants' Motion, ECF No 80, is DENIED. The Court will continue to exercise supplemental jurisdiction over Plaintiffs' claims against Cornerstone Defendants.

It is so ORDERED and DATED this __25th__ day of October, 2018.

        s/Michael J. McShane
MICHAEL McSHANE
United States District Judge