IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| LRY, LLC; FR, LLC, | Civ. No. 1:17-cv-00675-MC |
| Plaintiffs, | **OPINION & ORDER** |
| v. | |
| LAKE COUNTY; BRUCE ADDINGTON; CORNERSTONE INDUSTRIAL MINERALS CORPORATION U.S.A.; JUDITH HEFFNER, as personal representative for the ESTATE OF JOHN D. HEFFNER; CLARK HILL PLC, | |
| Defendants, | |
| *And* | |
| BRUCE ADDINGTON; CORNERSTONE INDUSTRIAL MINERALS CORPORATION U.S.A., | |
| Third-Party Plaintiffs, | |
| v. | |
| JUDITH HEFFNER, as personal representative for the ESTATE OF JOHN D. HEFFNER, | |
| Third-Party Defendant. | |

_____

McSHANE, District Judge.

This matter comes before the Court on Motions for Partial Summary Judgment filed by Plaintiffs LRY, LLC and FR, LLC against Defendant Lake County (the "County"), ECF No. 222, and against Defendants Judith Heffner as personal representative for the Estate of John D. Heffner (the "Estate,") and Clark Hill PLC (collectively, the "Clark Hill Defendants,"), ECF No. 232; on a Motion for Partial Summary Judgment filed by the County against Plaintiffs, ECF No. 239; on a Motion for Summary Judgment filed by the Clark Hill Defendants against Plaintiffs, ECF No. 329; and on a Motion for Partial Summary Judgment filed by Defendants and Third-Party Plaintiffs Cornerstone Industrial Minerals Corporation, U.S.A. ("Cornerstone,") and Bruce Addington against the Estate, ECF No. 187.

## BACKGROUND

Plaintiff LRY, LLC is an Oregon limited liability company with its principal place of business in Lakeview, Oregon. Fifth Amended Complaint ("FAC") ¶ 1. ECF No. 140. Plaintiff FR, LLC is a Washington limited liability company. *Id.* at ¶ 2. Paul Didelius is the president of LRY and FR. Didelius Decl. ¶ 1. ECF No. 224.

Defendant Lake County is an Oregon county with its county seat at Lakeview, Oregon. FAC ¶ 3.

Defendant Cornerstone is an Oregon corporation with its principal place of business in Lakeview, Oregon. FAC ¶ 5. Cornerstone mines, processes, and markets perlite. Addington Decl. ¶ 2. ECF No. 188. Defendant Bruce Addington is the president of Cornerstone and a resident of Florida. Addington Decl. ¶ 1; FAC ¶¶ 4, 6.

Defendant John D. Heffner was a resident of Virginia and an attorney licensed to practice law in Washington, D.C. Heffner Decl. ¶ 2. ECF No. 143. Prior to 2011, Heffner maintained his

own law office in Washington D.C., the office of John D. Heffner, PLLC.  Heffner Decl. ¶ 3;

Savage Decl. ¶ 3, ECF No. 153.

In October 2011, Heffner joined the Texas-based firm of Stasburger & Price LLP.  Terry

Decl. Ex. 2, at 1.  ECF No. 234.  In 2018, Strasburger & Price merged with Defendant Clark Hill

PLC.  Heffner Decl. ¶ 3.  Heffner continued to work as senior counsel for Clark Hill in the firm's

D.C. office after the merger.  *Id.* ¶ 1.  Heffner passed away in July 2019 and, in November 2019,

his widow Judith Heffner was appointed as the administrator for his Estate.  Knight Decl. Ex. 1.

ECF No. 221.  On April 2, 2020, the Court granted a motion to substitute Judith Heffner as personal

representative of the Estate.  ECF No. 257.

### I.    The Lakeview Branch

Lake County owns a 55-mile stretch of railroad known as the Lakeview Branch, which the

County purchased in 1985.  FAC ¶¶ 14, 17; Didelius Decl. ¶ 2.  In 2009, the prior operator of the

Lakeview Branch became defunct and the County began a search for a new third-party operator

for the line.  Didelius Decl. ¶ 2.

Following talks with the County, Paul Didelius formed LRY to operate the Lakeview

Branch and LRY commenced operations in May 2009 under Lake County's operating certificate.

Didelius Decl. ¶ 2.  At the time LRY took over the line, the Lakeview Branch had only two regular

shipping customers—the Collins Company ("Collins") and Cornerstone.  *Id.* at ¶ 4.  "Shipments

had historically been neither timely nor frequent, due to poor track condition and limited demand."

*Id.*  In addition to the Lakeview Branch, LRY also leased 60 miles of track in northern California

from the Union Pacific Railroad Company ("UP"), which allowed LRY to operate between

Lakeview, Oregon and Perez, California.  FAC ¶¶ 13-15.

## II.      LRY Retains Heffner to Negotiate the Lease

In 2009, LRY retained Heffner "to assist in drafting, negotiating, and approving a lease with Lake County for the rail operation of the Lakeview Branch."  Second Didelius Decl. ¶ 2, ECF No. 233.  Heffner also represented LRY before the Surface Transportation Board ("STB") and assisted in securing an interim operating and agency agreement with Lake County.  *Id.*

During this representation, Heffner was assisted by attorney James Savage.  Second Savage Decl. ¶ 4, ECF No. 338.  Savage was "of counsel" to John D. Heffner, PLLC from August 2007 to October 2011.  Savage Decl. ¶ 3.  Savage affirms that Heffner "supervised my work with Paul Didelius concerning the LRY proceedings," and "regularly advised and instructed me regarding the LRY matter."  Second Savage Decl. ¶ 4.  In his deposition, Savage testified that all John D. Heffner PLLC's clients "were Heffner's clients," including LRY.  Third Rossmiller Decl. Ex. 3, at 8.  ECF No. 336.  All invoices for work done on the LRY file were paid to Heffner.  *Id.* at 15.

In a sworn statement before the STB, Heffner stated that his work for LRY "never gave me access to any confidential client documents."  Olson Decl. Ex. 12, at 2.  ECF No. 282.  However, Savage affirms that both he and Heffner had privileged and confidential attorney-client communications with LRY and Paul Didelius, which affected the course of their lease negotiations with the County.  Second Savage Decl. ¶ 2.  Heffner was provided with copies of all communications between Savage and Didelius concerning LRY, which Heffner maintained in a paper file.  *Id.* at ¶¶ 3-4.  Communications between Heffner, Didelius, and Savage reveal that Heffner played an active role in the negotiations.  Third Rossmiller Decl. Ex. 1.

The County was aware of Heffner's involvement, as evidenced by communication between Savage, Heffner, and Lake County Attorney James Bailey during the lease negotiations.  Third Rossmiller Decl. Ex. 2.

### III.     The Lease

LRY and Lake County signed the Lease & Operating Agreement (the "Lease") on November 3, 2010.  Didelius Decl.  ¶ 3.  Under the Lease, LRY was "fully responsible for high quality personalized service in the operation of said rail lines," and "in addition shall assume all liability for the operation of said property, and LRY will be further responsible for all routine maintenance . . . and for the general upkeep of the railroad property."  Didelius Decl. Ex. 1, at 1. In turn, Paragraph 5.07 of the Lease provided that the County would be responsible for "the cost of all capital replacements, repairs, or reconstruction" necessitated by "non-routine maintenance of the structural integrity of the bridges and other infrastructure of the leased premises."  *Id.* at 4. Under Paragraph 5.08, the County was also responsible for the cost of compliance with bridge safety standards and for any replacements or repairs required.  *Id.*

Section 24 of the Lease describes the circumstances of default, either by LRY or by the County.  Didelius Decl. Ex. 1, at 15-16.  LRY would be in default in the event of failure to pay rent, by filing for bankruptcy, or by failure "in the performance of any terms, conditions, or covenants contained herein, which default results in the disruption of railroad services, as provided for in this agreement."  *Id.* at 16.  The County would be in default if it failed "in the performance of any terms, conditions, or covenants contained herein, which default results in the impairment of LRY's ability to provide railroad services."  *Id.*  Upon the occurrence of a breach by either party, the injured party was to notify the breaching party in writing, specifying the breach and "what corrective action is desired to cure the breach," and the breaching party would have thirty days in which to cure.  *Id.*

Section 13 of the Lease governs termination and is divided into five Paragraphs.  Didelius Decl. Ex. 1, at 8-9.  Paragraph 13.01 describes the circumstances in which for-cause termination

is permitted and provides that either party may terminate the Lease (1) in the event of unacceptable substantive conditions imposed in the regulatory approvals or exemptions; (2) upon the occurrence of a default, as defined in Section 24 of the Lease; (3) upon thirty days' written notice in the event of force majeure, lawful embargo, condemnation, or the taking of sufficient portions of the leased premises by eminent domain so as to prevent continuation of services; or (4) upon thirty days' notice to the County following LRY's obtaining all necessary regulatory approvals or exemptions needed to permit LRY to abandon or discontinue rail operations. *Id.* Paragraph 13.02 concerns the abatement of rent in the event of termination, while Paragraphs 13.03 and 13.04 concern transfer of operations on the Lakeview Branch in the event of termination. *Id.* at 9. The final Paragraph, 13.05, provides:

> In the event the County terminates this lease agreement without reasonable cause, including through condemnation of all or a sufficient portion of the leased premises to prevent service to one or more LRY customers, then, in that event, the County shall pay termination costs of twenty five thousand dollars ($25,000) to LRY as liquidated damages.

Didelius Decl. Ex. 1, at 9.

Section 27 of the Lease provided that all notices required by the Agreement should be addressed to the parties, with a copy to counsel. Didelius Decl. Ex. 1, at 17. James Bailey is listed as counsel for Lake County, while notices for LRY were to be sent to James Savage of John D. Heffner, PLLC in Washington, D.C. *Id.*

For the County, the Lease was signed by the members of the Lake County Board of Commissioners, including Brad Winters, and approved as to form by Bailey. Didelius Decl. Ex. 1, at 19. For LRY, the Lease was signed by Paul Didelius and approved as to form by Savage, who is again listed as working for John D. Heffner, PLLC. *Id.* Heffner also approved the Lease as part of his representation of LRY. Third Rossmiller Decl. Ex. 3, at 18.

The Lease was originally set to expire on December 31, 2014, with an option to renew. Didelius Decl. Ex. 1, at 2.  On November 3, 2010, LRY and the County amended the Lease to extend the term of the Lease through December 31, 2035, in order to qualify for grants from the State of Oregon.  *Id.* at 20.

## IV.    LRY as Operator of the Lakeview Branch

During its time as operator of the Lakeview Branch, LRY made considerable investments to improve the line, supported by loans from FR.  Didelius Decl. ¶ 5.  LRY and Lake County also sought and received grant funding from the State of Oregon through the *Connect*Oregon program. *Id.* at ¶ 6.  "Because a 20-year commitment to the *Connect*Oregon grant was required, the Lease was extended by another 21 years past its initial expiration date, to December 1, 2035, as reflected in the amendment executed on January 30, 2013."  *Id.* at ¶ 7.

Following the extension of the Lease term, LRY secured the rights to handle shipping for a new client, Red Rock Biofuels.  Didelius Decl. ¶ 9.  This contract was expected to be highly profitable for LRY.  *Id.*

Cornerstone and Addington were dissatisfied with LRY's performance as the operator of the Lakeview Branch and with the rates charged by LRY.  Third Rossmiller Decl. Ex. 36, at 9. LRY's other shipping client, Collins, was similarly dissatisfied.  Broadfoot Decl. ¶ 3, ECF No. 248.  LRY's shipping clients complained to the County and to one another about the poor quality of service they received from LRY.  Fourth Winters Decl., at 3, ECF No. 290; Second Knight Decl., Ex. 1, ECF No. 265; Second Winters Decl. ¶ 12, ECF No. 249.  The County was likewise dissatisfied with LRY's performance as operator of the Lakeview Branch.  *See, e.g.,* Third Franz Decl. Ex. 209, at 13.  ECF No. 291.  Officials at the Oregon Department of Transport also expressed concern about LRY's operation of the Lakeview Branch, particularly regarding training

and record-keeping.  Third Franz Decl. Ex. 208, at 35.  In addition to service issues, LRY also experienced derailments on the line.  Third Franz Decl. Ex. 213; Ex. 214.

LRY, for its part, attributed the problems of the railway to the condition of the track and bridges, which were the County's responsibility under the Lease.  Terry Supp. Decl. Ex. 2, at 1. ECF No. 341.  Regulators demanded significant investment in the Lakeview Branch and threatened LRY with substantial fines unless large capital investments were made in the line.  Third Franz Decl. Ex. 208, at 55.

On more than one occasion, LRY sought to purchase the Lakeview Branch from the County.  LRY maintained that, as a tenant, it could not "put in their money for capital improvement unless they are the owners of the railway."  Supp. Terry Decl. Ex. 2, at 1.  LRY did not intend to make large investments in improving the Lakeview Branch without first purchasing the line. Third Franz Decl. Ex. 208, at 39.  Nevertheless, LRY invested hundreds of thousands of dollars "to improve and stabilize Lake County's land infrastructure."  Didelius Decl. ¶ 5.

In May 2016, LRY presented Lake County with a proposal that LRY purchase the Lakeview Branch for $50,000 in cash and $500,000 in infrastructure investment over four years and LRY solicited its shipping clients for their support.  Third Franz Decl. Ex. 208, at 47-49. LRY's shipping clients were not supportive of the proposal and communicated their opposition to the County.  *Id.* at 54.

## V.    The Events of 2016-2017 and the Termination of the Lease

In October 2016, Addington hired Heffner to represent Cornerstone to advise "on the feasibility and process for terminating the lease between LRY and Lake County."  Addington Decl. ¶¶ 3-4; Terry Decl. Ex. 2, at 2.  Addington "also understood that [Heffner] represented me in my individual capacity."  Addington Decl. ¶ 3.

On October 14, 2016, Heffner sent an engagement letter to Addington confirming that Heffner would represent Cornerstone "covering the provision of legal services in a matter involving railroad service provided by Lake Railway ('LRY')," and that "[m]ore specifically, you have expressed an interest in purchasing the railroad either through a voluntary transaction with its existing owner or forcing the sale of the company and/or the underlying rail line (owned by Lake County) though the regulatory process and installing a better operator." Second Rossmiller Decl. Ex. 1, at 2-3. ECF No. 281. Heffner did not obtain written consent from Addington or Cornerstone concerning Heffner's prior representation of LRY in connection with the negotiation and drafting of the Lease. Addington Decl. ¶ 5.

In Heffner's October 14, 2016 engagement letter, which was sent under Strasburger & Price letterhead, Heffner reported "[w]e have checked our conflict of interest records and have found no indication of any current or prior representation that would be a conflict." Second Rossmiller Decl. Ex. 1, at 3. In an email sent to Addington on the same day, Heffner wrote:

> Please accept my apologies for taking a little more time to undertake the new client intake process. As I had represented Frontier, Lake Railway's owner, before joining Strasburger more than 5 years ago, I wanted to make sure there would be no conflict in undertaking your representation. I have confirmed by checking with Lake County's attorney that there is not conflict. I should note that the County's attorney, Jim Bailey, is very concerned about what Lake Railway is trying to do. I have recommended that Lake County work with RL Banks.

Second Rossmiller Decl. Ex. 1, at 9-10.

Heffner subsequently affirmed in a Verified Statement that he had "contacted our firm's ethics partner and we concluded that there was no conflict due to the substantial passage of time, as well as Lake Railway not being a current client, and the fact that this work did not entail the railroad's STB authority or the lease, i.e.—the matters were not substantially related." Terry Decl. Ex. 2, at 2.

Neither Heffner, nor Strasburger & Price/Clark Hill ever contacted Didelius to inquire about the scope of the work Heffner had done for LRY. Third Didelius Decl. ¶ 6. ECF No. 337. Heffner did not seek or receive written consent from LRY for his subsequent representation of Cornerstone. *Id.* Nor did Winters or Bailey ever disclose to Didelius that they were working with Heffner to remove LRY as the operator of the Lakeview Branch. *Id.* at ¶ 7.

On October 13, 2016, Heffner emailed Addington that "it is the County that needs to take the lead here" because it "is the only party that has access to the rail line for the purpose of inspection as well as access to the railroad's records." Second Rossmiller Decl. Ex. 1, at 1. Heffner suggested that Cornerstone and Collins might pay for the inspection on the County's behalf and advised Addington that the County would need to pursue inspection "in order to be successful," and that his "strongest recommendation would be that the County retain RL Banks to do any physical inspection and review of the railroad's records." *Id.*

Also on October 13, 2016, Tom Messer of RL Banks forwarded the Lease to Heffner with the note "for your review." Second Rossmiller Decl. Ex. 1, at 11. In an email to Messer, Heffner acknowledged that John D. Heffner PLLC had approved the Lease as to form but said that Savage had been the one to sign the document. Second Rossmiller Decl. Ex. 3. Heffner then forwarded the Lease to Addington on October 24, 2016. Second Rossmiller Decl. Ex. 1, at 11.

On October 21, 2016, Heffner emailed Messer and Bailey with his analysis of the terms of the Lease and a recommendation that the County and LRY's shipping clients should pressure Union Pacific concerning its contract with LRY:

> I reviewed the agreement and see numerous default grounds. Sec. 5 contains some provisions including maintenance requirements and reporting and sec. 6 contains additional reporting requirements for which noncompliance would appear to be a default ground. But I read sec. 26 as stating that failure to perform any conditions, covenants, etc., will result in a default if the default results in a disruption of service and continues for 30 days after notice is given. Arguably failure to maintain

> resulting in a service suspension could be considered a default justifying a notice of termination; however LRY could argue that the County is not entitled to give notice of termination until it first provides notice of default and the default goes uncured for 30 days . . . Regarding the termination w/o reasonable cause, I read this as saying that the County would owe the railroad $25,000 but it would not preclude the railroad from suing the county for breach of contract.

Second Rossmiller Decl. Ex. 1, at 13-14.

On October 24, 2016, Heffner emailed Addington to report that Heffner had spoken with Bailey and "understood him to say that the County has had enough of Lake Railway and is on the verge of sending out a letter (probably later this week) saying that they want to change operators," and

> He says that they are amendable to hiring RL Banks with you and/or Collins bearing all or most of the costs. Among other things, the work would include a current track inspection which the County has the right to do but you don't. I reviewed with Jim my assessment as to the grounds that the County has under the agreement for finding default as a basis for termination. I suggested that some of those grounds give Lake Railway an opportunity to cure. The best approach may be to pay them $25,000 or more to leave . . . I reviewed with Jim various regulatory legal scenarios for Lake Railway's departure from the line. Finally, I noted that any successful replacement of Lake Railway also requires that the new operator become the new lessee on the UP line from Alturas to Perez otherwise Lake Railway would have a stranglehold on the County's rail line. The County has more clout than you or Collins to persuade UP to change lessees.

Second Rossmiller Decl. Ex. 1, at 15.

The next day, October 25, 2016, Heffner emailed Addington again to advise him that "I am not going to communicate in writing with Tom Messer or others at RL Banks until they are engaged and at that I want to make sure that nothing I say can be the subject of any discovery. Communications between us and any consultants you hire is privileged and not discoverable." Second Rossmiller Decl. Ex. 1, at 16. Heffner reported that the County was preparing to send LRY a letter "stating a desire to terminate their operating agreement," and that "[t]he next thing I've told the County they must do is arrange for an inspection of the line to compare its condition

today with that in 2009.  That could be a basis for default."  *Id.*  Heffner then advised Addington

on the steps to take to prepare his own carrier to take over operations on the Lakeview Branch.  *Id.*

"Once we have the County on board, the County should exert some political muscle and go to the

UP about terminating the lease with Lake Railway and executing a new lease with your railroad."

*Id.*

      On October 31, 2016, Heffner emailed Addington to report that Bailey had confirmed that

"the County is moving on engaging RL Banks."  Second Rossmiller Decl. Ex. 1, at 23.  On

November 2, 2016, Bailey emailed Heffner to inform him that the County had approved the

contract with RL Banks and that Bailey would be "sending a letter to Paul Didelius expressing

concern over operations and observing that Lake Rwy may be in breach of the Operating

Agreement."  *Id.* at 24.  Heffner replied with an offer to assist with the County's letter, to which

Bailey responded: "Not this one, maybe the next one in which we actually do assert that they've

breached the agreement.  We want to get their response to a less threatening letter first."  *Id.*

      On November 4, 2016, Heffner emailed Addington with additional advice about setting up

a new railway operator to replace LRY and to update Addington on the progress of the plan to

remove LRY:

> Where things stand right now is that I am going to have lunch with Charlie Banks
> Monday.  I have asked Jim Bailey (Lake County) to hold off sending his letter to
> Lake Railway so that Charlie and I can review it.  Jim has agreed.  You ought to
> see it as well.  I want to make sure everything is iron clad and we don't want any
> "wiggle room."  I expect that we shall have some things to talk about early next
> week.

Second Rossmiller Decl. Ex. 1, at 25.

      On November 7, 2016, Bailey sent a letter to LRY on behalf of the County informing LRY

that the County was concerned about LRY's performance as the operator of the line and "it appears

that Lake Railway has either breached or come very close to breaching the Lease and Operating

Agreement." Second Franz Decl. Ex. 206, at 1. ECF No. 245. The letter listed some specific concerns and stated that "even if Lake Railway conducts its operations in a manner that technically avoid a breach of the Agreement, Section 13.05 allows Lake County to terminate the agreement 'without reasonable cause,'" but assured LRY "[a]gain, to be clear, Lake County is not at this point declaring a breach or termination of the Agreement, but Lake County is notifying Lake Railway of its concerns regarding the level of quality of operations." *Id.* at 1-2.

On November 10, 2016, Heffner provided Addington with the promised update following Heffner's call with the County. In that email, Heffner informed Addington that the County would be requiring LRY to allow RL Banks to review financial records from LRY, including the contract with Red Rock, and that the County was "favorable to you taking over the line." Second Rossmiller Decl. Ex. 1, at 26-27. Heffner also reported "I need to confirm that 'three-way communications' between or among us, the County, and Charlie Banks are not discoverable in any litigation brought by LRY." *Id.* at 26.

Ultimately, Addington and Cornerstone paid $20,000 for the RL Banks inspection and Addington wrote in a November 2016 email that the inspection was "integral to the county in confirming that the line is not in better shape today than the day LRY took it over and thus grounds for replacing them along with their lousy service." Third Rossmiller Decl. Ex. 14, at 1.

On January 10, 2017, Bailey emailed Heffner and Messer to confirm their mutual plan for RL Banks to perform an inspection of the line and to get a copy of LRY's contract with Red Rock. Second Rossmiller Decl. Ex. 5, at 12-13. Among the steps contemplated was that the County would put LRY on notice of the County's desire to terminate the Lease, and "if Lake Rwy refuses, then the County exercises Section 13.05 (termination without cause) and tenders $25,000 in liquidated damages." *Id.* at 13. The County would then seek a new operator for the Lakeview

Branch and Addington "might step in to fulfill this need." *Id.*  On January 13, 2017, Heffner responded with revisions to the list, including the formal engagement of RL Banks to prepare a report on the condition of the line.  *Id.* at 10.  Heffner also suggested that Addington would refrain from communicating with LRY "except on routine service matters."  *Id.*

In a January 18, 2017 email, Heffner told Addington that "[l]itigation costs money and I think you have more than LRY."  Third Rossmiller Decl. Ex. 18, at 1.  Addington replied urging him to "prod/support Lake county in getting rid of the Didalius [sic] brothers," and that "[a]n optimum time for them to be gone and the new operator (Goose Lake Line) to be set up and operating is late July."  *Id.*

On January 19, 2017, LRY General Manager Rob Didelius emailed Addington, Collins, and the County that LRY has tried to "run cheap" since 2009 but was "no longer willing to take the risks associated with the bare bones style of operating demanded by our landlord."  Third Rossmiller Decl. Ex. 20, at 2.  LRY would "accelerate our replacement of dilapidated 100-year old small rail and worn-out 50 year old ties," but asserted that "Lake County has failed to fund the bridge maintenance and track capital expenditures for which they are contractually responsible." *Id.*  Rob Didelius informed them that LRY would be increasing its rates "to rebuild the railroad at a pace that satisfies regulators and provides for safe and consistent operation by our crews."  *Id.*

On January 30, 2017, Heffner responded to a request from Bailey and offered his interpretation of the Lease:

> Jim [Bailey] per your request I looked at sec. 508.  Literally speaking it does obligate the County for the cost of compliance with FRA bridge maintenance standards and any rehabilitation, reconstruction, replacements or repairs that might be required.  But the lease contains an ambiguity.  Sec. 5.03 requires LRY to maintain the lease premises (and premises includes bridges) to the condition that they were in on the commencement date.  But sec 5.07 requires the County to be responsible for the cost of all capital replacements, repairs, or reconstruction

necessitated by non-routine maintenance of the structural integrity of the bridges and other infrastructure of the leased premises.

Bruce [Addington] is confronted by the problem that LRY is threatening not to deliver his cargo because of bridge damage. He needs to come up with a practical solution. One remedy which he has suggested is Cornerstone advancing money to the county so it can hire a contractor to undertake necessary repairs. Another solution might be to have the surcharge that LRY wants to impose paid into a trust account to fund necessary maintenance. But the RLBA inspection cannot begin soon enough. We need to get them on the line while LRY perceives a need to be somewhat cooperative. I believe that window is very short.

Third Rossmiller Decl. Ex. 21.

In early February 2017, Heffner and Bailey exchanged further emails concerning the proper interpretation of the Lease and specifically which party bore responsibility for repair of the Lakeview Branch. Second Rossmiller Decl. Ex. 5, at 7. Ultimately, Bailey concluded that the County, rather than LRY, bore the duty of inspecting and repairing the line. *Id.*

On February 14, 2017, Heffner wrote to Bailey to discuss the results of the unreleased RL Banks report on the inspection of the Lakeview Branch:

Jim, Tom Messer just called me to say that his inspector just finished a high rail trip over the line. His report should be ready next week. Tom gave me a "heads up." Sounds like a gross case of mismanagement and incompetent maintenance by the railroad and maybe the County as well. Rather than characterize things any more than I can, I'd recommend that you read the report when it comes out. It also appears that no report of the railroad's condition was undertaken when Lake Railway took over in 2009.

Second Rossmiller Decl. Ex. 5, at 6.

On February 21, 2017, Heffner also wrote to Addington to discuss the results of the RL Banks inspection:

Bruce, I want to schedule a call sometime this week with RL Banks, the County, and you . . . RLBA is through with its inspection and I suspect that there are some lapses on the county end of things. So we need a "where do we go from here" discussion.

Second Rossmiller Decl. Ex. 1, at 30.

On March 21, 2017, RL Banks submitted its inspection report on the condition of the Lakeview Branch. Third Rossmiller Decl. Ex. 31. The report concluded that the Lakeview Branch was in severely degraded condition and "a significant capital expenditure of nearly $30 million would be required to decrease travel time over the 54.45 miles from five hours and twenty-four minutes to two hours and nine minutes." *Id.* at 12.

During a mediation between LRY and the County in late March 2017, LRY made another offer to purchase the Lakeview Branch, which County Commissioner Winters interpreted as an ultimatum. Fourth Winters Decl., at 5. On March 27, 2017, Bailey emailed Heffner with a detailed summary of the mediation. Second Rossmiller Decl. Ex. 5, at 3. Then, on March 28, 2017, Heffner emailed Addington, Banks, Messer, and Bailey with a summary of the County's mediation with LRY. *Id.* at 1-2. Heffner recommended that the County not sell the Lakeview Branch to LRY "as they simply cannot be trusted," and that the County should have other operators bid on the line. *Id.* at 2. Messer responded to the same group of recipients that he agreed with Heffner's recommendations and added that he believed that if Heffner and RL Banks "had adequate input into the drafting of a new agreement by Jim [Bailey], we can draft language that would protect the interests of the County, shippers and operators provided the County stayed on top of its investment and responsibilities." *Id.* at 1.

On April 5, 2017, the Lake County Board of Commissioners voted to reject LRY's offer to purchase the Lakeview Branch. Third Franz Decl. Ex. 208, at 15. On April 6, 2017, Bailey informed Heffner that the County had rejected LRY's offer and that "[w]e will be moving forward to research options regarding finding another operator," but that "[n]o formal decision has been made regarding termination of the current contract because certain issues still need to be addressed (such as talking to UP and determining if another short line operator is interested)." *Id.* at 10.

On the same day, April 6, 2017, Heffner emailed Bailey, Messer, Banks, and Addington, that "our next steps would be to issue a notice of termination (Jim, is a notice of default required first?) and ask if [LRY] will leave voluntarily."  Second Rossmiller Decl. Ex. 9, at 1-2.  Bailey responded: "We don't actually have a basis for default under the lease—all of the default provisions refer to providing service and we must give the RR 30 days to correct the problem.  We are going to terminate under the 'terminate and pay $25,000.'"  Second Rossmiller Decl. Ex. 10.

On April 7, 2017, Heffner emailed Addington, Bailey, and Messer to tell them that "the County will soon notify Lake Railway (LRY) that its agreement to lease and operate the line is terminated at a future date to be identified with LRY to cooperate in an orderly transition to a new operator," and discussed steps to be taken in the event Addington established his own railroad company.  Third Franz Decl. Ex. 208, at 6-7.  Bailey replied to clarify that "the Board will meet next week to discuss the question of termination of the lease" and that "[n]o decision has been reached at this point."  *Id.* at 6.

On April 12, 2017, Bailey emailed Heffner to inform him that "[e]ffective April 30, the lease will terminate.  Lake County will contact UP to discuss the situation with them."  Second Rossmiller Decl. Ex. 1, at 31.  Bailey also asked Heffner to "[p]lease advise as to Bruce Addington's ability to function as nominal operator as well as anything you feel Lake County should do at this point."  *Id.*  Heffner forwarded the email to Addington, with the addition "Looks like you just got your chance."  *Id.*

On April 12, 2017, the Lake County Board of Commissioners met in special session during which Commissioner Winters "moved to terminate lease with Lake Railway referring to Section 13.05 effective April 30, 2017."  Third Franz Decl. Ex. 208, at 4.  The motion carried unanimously.  *Id.*  On the same day, Bailey notified LRY of the County's decision in a letter, which read:

The Lake County Board of Commissioners has directed me to inform you that the County is exercising its right to terminate the lease with Lake Railway under Section 13.05 of the Lake Railway Lease Agreement.  Termination of the Lease will be effective as of April 30, 2017 at which time Lake County will forward $25,000 to Lake Railway as called for under Section 13.05.

Didelius Decl. Ex. 5.

Winters maintains that he does not recall dealing directly with Heffner until after the effective date of the termination and that the decision to terminate LRY as the operator of the Lakeview Branch was not related to Heffner.  Fourth Winters Decl., at 6.  Winters attributes the decision to terminate the Lease to LRY's "ultimatum" concerning the sale of the Lakeview Branch. *Id.* at 7.

After the Lease was terminated, Addington expressed reservations about taking over as the operator of the Lakeview Branch.  On April 20, 2017, Bailey emailed Heffner that "[y]our last email make it sound as though, despite expressing a willingness to be the nominal owner/operator of the line, Bruce's level of interest has greatly diminished now that the County has terminated the lease.  This is puzzling to say the least."  Rossmiller Decl. Ex. 8,  ECF No. 269.  Bailey informed Heffner that "the County has proposed to Lake Rwy that it meet with the shippers and work out an agreement for continued operation" and that "[i]f an agreement can be reached between Lake Rwy and the shippers, the County will consider rescinding the termination."  *Id.*

On April 28, 2017, LRY commenced this action and filed a motion for a temporary restraining order ("TRO") enjoining the County from terminating the Lease.  ECF Nos. 1, 2.  On May 1, 2017, the Court granted the TRO and set a hearing for a preliminary injunction for May 12, 2017.  ECF No. 8.  Following the May 12, 2017 hearing, the Court denied the preliminary injunction and dissolved the TRO.  ECF Nos. 17, 18.

At some point after LRY was terminated as the operator of the Lakeview Branch, the County retained Heffner to represent the County "in its efforts to remove Lake Railway as operator of the County-owned rail line between Lakeview, OR and Alturas, CA."  Olson Decl. Ex. 3, at 1. On May 23, 2017, Heffner sent a letter to Addington memorializing their understanding concerning Heffner's subsequent representation of the County.  *Id.*  In that letter Heffner explained that his work for the County "essentially replaces some of the work that I was previously doing for the County at Cornerstone's expense," and would include "supporting Jim Bailey's civil litigation efforts in Oregon," but that Heffner would "continue to be available to represent Cornerstone in any railroad service issues that it has with Lake Railway."  *Id.*  Heffner also informed Addington that he had "written Brad Winters a similar letter."  *Id.* at 2.

On June 7, 2017, Heffner emailed Addington to recommend one of Heffner's former associates to assist Addington in negotiating a lease with the County to take over operations on the Lakeview Branch.  Second Rossmiller Decl. Ex. 1, at 43.  Heffner told Addington that Bailey would be working for the County on the new lease and that, once the new lease was in place, Heffner would represent both Addington and the County before the STB.  *Id.*

On June 14, 2017, Bailey emailed Heffner on behalf of the County: "Whatever you can do to light a fire under Bruce [Addington] and the attorney working on the lease proposal would be greatly appreciated.  The county is hemmoraging [sic] money and extremely motivated to move forward."  Second Rossmiller Decl. Ex. 1, at 44.  Heffner forwarded the email to Addington.  *Id.*

On August 31, 2017, the County entered into a new lease with Goose Lake Railway, LLC, under which Goose Lake would serve as the operator of the Lakeview Branch.  Rossmiller Decl. Ex. 3.  ECF No. 225.  Addington is the president of Goose Lake.  FAC ¶ 71.   LRY ceased operations on the Lakeview Branch in September 2017.  Didelius Decl. ¶ 14.

## LEGAL STANDARD

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec.*, 809 F.2d at 630-31.

## DISCUSSION

The Court concludes that the pending motions are most efficiently addressed as cross-motions between Plaintiffs and Lake County and between Plaintiffs and the Clark Hill Defendants, with Cornerstone and Addington's Motion for Partial Summary Judgment against the Estate addressed separately.

## I.      Cross-Motions for Summary Judgment between Lake County and Plaintiffs

As relevant to the present motions, Plaintiffs bring claims for breach of contract against Lake County, as well as claims for violation of Plaintiffs' substantive and procedural due process rights pursuant to 42 U.S.C. § 1983.  Plaintiffs also seek declaratory judgment concerning the proper interpretation of Paragraph 13.05 of the Lease.

### A. Declaratory Judgment

Plaintiffs' Fourth Claim for Relief seeks a declaratory judgment "of the proper interpretation of Paragraph 13.05 and whether the liquidated damages provision is valid and enforceable." FAC ¶ 103.  As noted, Paragraph 13.05 of the Lease provides:

> In the event the County terminates this lease agreement without reasonable cause, including through condemnation of all or a sufficient portion of the leased premises to prevent service to one or more LRY customers, then, in that event, the County shall pay termination costs of twenty five thousand dollars ($25,000) to LRY as liquidated damages.

Didelius Decl. Ex. 1, at 9.

In order to determine whether a contract contains an unlawful liquidated damages clause, Oregon courts engage in a two-step inquiry.  The court must first determine if the disputed clause "actually is a liquidated damages clause," and the "if the disputed clause is a liquidated damages clause, we must determine whether it is imposed as an unlawful penalty."  *Kesterson v. Juhl*, 157 Or. App. 544, 548 (1998) (citing *DiTommaso Realty, Inc. v. Moak Motorcycles, Inc.*, 309 Or. 190, 195 (1990)).

With respect to the first step of the inquiry, "[a] liquidated damages clause consists of 'words of a contract that set the amount of damages to be recovered by one party from another in case of the latter's failure to perform as agreed,'" as distinguished "from a clause that merely requires payment when a contract term has been satisfied."  *Kesterson*, 157 Or. App. at 548

(quoting *DiTommasso*, 309 Or. at 195). The specific terms used by the parties are not necessarily dispositive of the inquiry. *See DiTommaso*, 309 Or. at 194-95 ("This court, however, did not address whether, despite any labels used in the contract, the provision *constituted* a liquidated damages provision." (emphasis in original)).

In this case, the Court concludes that Paragraph 13.05 is a liquidated damages provision. Although the County seeks to present Paragraph 13.05 as permitting it to terminate the Lease at will upon payment of $25,000, the plain language of Paragraph 13.05 does not support such a reading. By the plain terms of the clause, payment of "termination costs" in the amount of $25,000 is only required in the event that the County terminates the Lease "without reasonable cause." The requirement that $25,000 be paid to LRY is presented as a consequence of termination "without reasonable cause," *i.e.,* a breach of the contract, rather than as a condition precedent to at-will termination.[1] Additionally, the fact that the Lease specifically refers to this money as "liquidated damages," bolsters this reading because, as the Oregon Supreme Court observed in *DiTammaso*, liquidated damages are only paid in the event that a party has "fail[ed] to perform as agreed." *DiTommasso*, 309 Or. at 195. The County has failed to offer any plausible alternative explanation for the Lease's use of the term "liquidated damages" and so the Court construes the term according to its plain meaning. Such a reading is both internally consistent and gives effect to each term of Paragraph 13.05. This reading also leads inexorably to the conclusion that Paragraph 13.05 is a genuine liquidated damages provision.

Once a court has identified a genuine liquidated damages clause, the next step is to determine if the clause is unlawful. The "initial point of departure for analyzing the validity of a

---

[1] A clause that read, for example, that "upon payment of $25,000 to LRY, the County may terminate the Lease," would be more congruent with the County's preferred interpretation of Paragraph 13.05.

liquidated damages provision is ORS 72.7180(1)." *Kesterson*, 157 Or. App. at 549 (quoting

*Illingworth v. Bushong*, 297 Or. 675, 692 (1984)).[2] That statute in turn provides that

> Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or nonfeasibility if otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty.

ORS 72.7180(1).

Although the statute expressly states that an unreasonably large liquidated damages clause

will be void as a penalty, Oregon courts have endorsed the *Restatement (Second) of Contracts* as

a source of guidance in assessing a disputed liquidated damages clause. *Illingworth*, 297 Or. at

693 (distinguished on other grounds in *DiTommaso*, 309 Or. 190). The *Restatement* in turn

provides that "[a] term that fixes an unreasonably small amount as damages may be unenforceable

as unconscionable." *Restatement (Second) of Contracts*, § 356 cmnt. a (1981).

In this case, Plaintiffs have demonstrated that the $25,000 sum of liquidated damages

provided for in the Lease was not a reasonable forecast of their damages in the event of breach,

even if the sum was limited only to the "termination costs" of ending operations on the Lakeview

Branch, and that their actual damages exceeded $25,000 many times over. The record does not

support the conclusion that the damages flowing from termination without reasonable cause would

be particularly difficult to prove or that it would be inconvenient or unfeasible for LRY to obtain

an adequate remedy. Accordingly, the Court concludes that the liquidated damages clause of

Paragraph 13.05 is unenforceable.

---

[2] Although "strictly speaking, [ORS 72.7180] applies only to contracts for the sale of goods," Oregon courts apply the same rule to other types of contract. *Kesterson v. Juhl*, 157 Or. App. 544, 549 (1998) (citing *Illingworth v. Bushong*, 267 Or. 675, 692 (1984)).

In sum, the Court grants Plaintiffs' motion for summary judgment as to the proper interpretation of Paragraph 13.05 of the Lease. For the reasons set forth above, the Court concludes that Paragraph 13.05 is a liquidated damages provision, and thus may only be invoked in the event of a breach of contract, but that it is invalid and unenforceable as such because the amount of liquidated damages provided for by Paragraph 13.05 is not reasonable.

### B. Breach of Contract

Both Plaintiffs and the County seek summary judgment as to Plaintiffs' claim for breach of contract, although Plaintiffs seek summary judgment only as to the question of liability. To sustain a claim for breach of contract under Oregon law, a plaintiff must plead and prove the existence of a contract, the relevant terms of the contract, the plaintiff's full performance and lack of breach, and the defendant's breach resulting in damage to the plaintiff. *Slover v. Oregon State Bd. of Clinical Soc. Workers*, 144 Or. App. 565, 570 (1996).

All parties agree that the Lease is the relevant contract for purposes of this claim and that the County invoked Paragraph 13.05 in terminating the Lease. The County contends that Paragraph 13.05 gives it the right to terminate the Lease at will upon payment of $25,000 and that the County's exercise of that right does not constitute a breach of contract. As discussed in the previous section, however, the Court has concluded that Paragraph 13.05 is a liquidated damages clause and liquidated damages are only paid in the event of a breach of contract. *DiTommasso*, 309 Or. at 195. Consistent with that ruling, the Court concludes that Paragraph 13.05 did not give the County the right to unilaterally terminate the Lease without cause. Accordingly, the Court concludes that the County's termination of the Lease constituted a breach and Plaintiffs have produced evidence that the breach resulted in damages.

The only remaining element, therefore, is LRY's own full performance and lack of breach and the County contends that LRY cannot demonstrate its own full performance.

With regard to any breach of the express terms of the Lease, in an April 6, 2017 email exchange between Heffner and Lake County Attorney James Bailey, Heffner asked if a notice of default is required before the County issues a notice of termination. Second Rossmiller Decl. Ex. 10. Bailey responded:

> We don't actually have a basis for default under the lease—all of the default provisions refer to providing service and we must give the RR 30 days to correct the problem. We are going to terminate under the "terminate and pay $25,000."

Second Rossmiller Decl. Ex. 10.

Consistent with that position, the April 12, 2017 termination letter sent to LRY only references termination under Paragraph 13.05, without reference to breach or default of any express term of the Lease by LRY. Didelius Decl. Ex. 5.

However dissatisfied the County may have been with LRY's performance as the operator of the Lakeview Branch, its own attorney affirmed that the County had no basis for declaring LRY in default under the Lease. And, as previously discussed, Paragraph 13.05 is a liquidated damages clause and liquidated damages are only provided for in the event of a breach of contract.

In its Reply brief, the County advances an entirely new argument—that LRY was in breach of its duty of good faith and fair dealing and that LRY cannot, therefore, demonstrate full performance and lack of breach for purposes of its claim for breach of contract. In support of this argument, the County offers declarations and emails showing LRY's poor performance as the operator, its contentious relationship with its shipping clients, and what the County construed as an "ultimatum" demanding that the County sell the Lakeview Branch to LRY for an unreasonably low price. The County asserts that it was these issues that led it to terminate the Lease and that

LRY's conduct amounted to a breach of the duty of good faith and fair dealing. The County further contends that this breach will prevent Plaintiffs from showing that LRY had fully performed under the Lease and defeat Plaintiffs' motion for summary judgment on the breach of contract claim.

In Oregon, "[t]he law imposes a duty of good faith and fair dealing in the performance and enforcement of every contract." *Hampton Tree Farms, Inc. v. Jewett*, 320 Or. 599, 615 (1995). The duty of good faith and fair dealing effectuates the reasonable contractual expectations of the parties. *See Best v. U.S. Nat'l Bank*, 303 Or. 557, 565 (1987). The purpose of the duty "is to prohibit improper behavior in the performance and enforcement of contracts, and to ensure that the parties 'will refrain from any act that would have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Klamath Off-Project Water Users, Inc. v. Pacificorp*, 237 Or. App. 434, 445 (2020) (quoting *Iron Horse Engineering v. Northwest Rubber*, 193 Or. App. 402, 421 (2004)). A party may violate the covenant of good faith and fair dealing without breaching the express terms of the contract. *Id.* The covenant, however, "'cannot contradict an express contractual term, nor otherwise provide a remedy for an unpleasantly motivated act that is expressly permitted by the contract.'" *Id.* (quoting *Zygar v. Johnson*, 169 Or. App. 638, 645 (2000)).

However, although a claim for breach of contract and a claim for breach of the covenant of good faith and fair dealing are related, each is distinct. *See Morrow v. Red Shield Ins. Co.*, 212 Or. App. 653, 662 (2007) (holding that the insurer was entitled to summary judgment on the plaintiffs' breach of contract claim but allowing the duty of good faith and fair dealing claim based on the same facts to proceed to trial); *Veloz v. Foremost Ins. Co.*, 306 F. Supp. 3d 1271, 1281 (D. Or. 2018) (stating that "[t]he law should not allow every breach of contract, even

those accidental, inadvertent, or caused by honest mistake to deliver plaintiff a successful additional claim for the breach of the duty of good faith.").

Given that a claim for breach of contract and a claim for breach of the duty of good faith and fair dealing are distinct and that, in cases where both claims are alleged, each may survive the dismissal of the other, the Court concludes that the County's arguments concerning an alleged breach of the duty of good faith and fair dealing by LRY do not create a genuine issue of material fact with respect to LRY's full performance and lack of breach under the express terms of the Lease. Given the County's admission in its communications with Heffner that it could not show that LRY was in default under the Lease, the Court concludes that LRY is entitled to summary judgment on the issue of liability for its claim for breach of contract against the County. The issue of damages must await further litigation.

### C. Due Process

Plaintiffs' Third Claim for Relief alleges that LRY had "a protectable property interest in the Lease and the leased premises, in the *Connect*Oregon grant agreements and in the control of its business and pricing." FAC ¶ 95. Plaintiffs allege that, in terminating the Lease and removing LRY as the operator of the Lakeview Branch, the County committed an illegal taking under the Fifth Amendment and a denial of substantive and procedural due process and equal protection under the Fifth and Fourteenth Amendments. *Id.* at ¶¶ 98-99. In its motion, the County seeks summary judgment as to Plaintiffs' claims for denial of due process protections under 42 U.S.C. § 1983 on the ground that Plaintiffs have failed to demonstrate a protectable property interest.

Title 42 U.S.C. § 1983 "provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights." *Conn v. Gabbert*, 526 U.S. 286, 290 (1999). To maintain a claim under § 1983, "a plaintiff must both (1) allege the deprivation of

a right secured by the federal Constitution or statutory law, and (2) allege that the deprivation was committed by a person acting under color of state law." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006).

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "A threshold requirement to a substantive or procedural due process claim is the plaintiff's showing of a liberty or property interest protected by the Constitution." *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 62 (9th Cir. 1994).

Property interests "are created and their dimensions defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regens of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.* "[F]ederal constitutional law determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." *Memphis Light, Gas, & Water Div. v. Craft*, 436 U.S. 1, 9 (1978) (quoting *Roth*, 408 U.S. at 577).

In this case, the County contends that a commercial lease cannot create a protected property interest for purposes of a due process claim. While it is true that "[p]roperty interests are most often discussed in the context of public employment," *Addison v. City of Baker City*, 258 F. Supp. 3d 1207, 1233 (D. Or. 2017), that is not the only sort of property interest protected by the Fourteenth Amendment. "Rather, 'property' denotes a broad range of interests that are secured by existing rules or understandings" and a "person's interest in a benefit is a 'property' interest for

due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." *Perry v. Sindermann*, 408 U.S. 593, 601 (1972) (internal quotation marks and citations omitted). More to the point, "[m]any courts have recognized that leases, including commercial leases, involving the use of a property give rise to a protected property interest." *Cross Continent Dev., LLC v. Town of Akron*, 742 F. Supp. 2d 1179, 1188-89 (D. Colo. 2010) (collecting cases). Accordingly, the Court concludes that the Lease is not, by virtue of being a commercial lease, prevented from creating a protected property interest for purposes of a due process claim.

More substantively, the County argues that the Lease does not create a protected property interest because it was terminable at will under Paragraph 13.05. As discussed in the preceding sections, however, the Court had concluded that Paragraph 13.05 was a liquidated damages provision to be invoked in the event the County breached by terminating the Lease "without reasonable cause," rather than a provision that granted the County the power to unilaterally terminate the Lease. Accordingly, the Court concludes that the County is not entitled to summary judgment on Plaintiffs' claims for violation of their due process rights under § 1983.

## II.     Cross-Motions for Summary Judgment between the Clark Hill Defendants and Plaintiffs

In their Fifth Amended Complaint, Plaintiff bring claims for (1) tortious interference with business relationships or expectations; (2) tortious interference with contracts; (3) tortious interference with economic relations; (4) intentional interference with prospective economic advantage; (5) breach of the fiduciary duty of loyalty; (6) breach of the fiduciary duty of confidentiality; (7) legal malpractice; and (8) breach of contract against the Estate. As to Clark Hill, Plaintiffs bring claims for negligent supervision and vicarious liability for the alleged

tortious interference, breaches of fiduciary duty, and malpractice by Heffner.    Plaintiffs seek punitive damages against the Clark Hill Defendants.

Plaintiffs seek summary judgment as to their claims for legal malpractice and breach of the fiduciary duty of loyalty and for Clark Hill's vicarious liability on those claims. In their cross-motion for summary judgment, the Clark Hill Defendants seek summary judgment in their favor on all claims.

### A. Fiduciary Duty of Loyalty

Plaintiffs allege that Heffner owed LRY a fiduciary duty of loyalty and a fiduciary duty of confidentiality arising out of his representation of LRY in the formation of the Lease.  Plaintiffs allege that Heffner's duty of loyalty extended to refraining from representing another client in the same or substantially related matter when the subsequent clients' interests are materially adverse to the interests of the former client without the informed consent of the former client.  Plaintiffs allege that Heffner breached his duty of loyalty by undertaking to represent Cornerstone and Addington in their efforts to remove LRY as the operator of the Lakeview Branch.

Attorneys owe their clients "a duty of loyalty, good faith, and fair dealing." *Pereira v. Thompson*, 230 Or. App. 640, 654 (2009).  To support a claim for breach of the fiduciary duty of loyalty, the plaintiff "must plead and prove the breach, and must show that the breach caused an identifiable loss or resulted in injury to the party."  *Id.* (internal quotation marks and citation omitted).  Breach of the duty of loyalty is established by showing that the attorney "had a conflict of interest or was self-dealing" and it "is incumbent upon the [attorney] to defend against the claim by showing full disclosure, or some other matter of defense."  *Id.* at 654-55 (internal quotation marks and citation omitted).

The Clark Hill Defendants first challenge the existence of a continuing fiduciary duty between Heffner and LRY after Heffner's legal work for LRY was complete. This requires an examination of the sometimes-vague boundaries of the duty of loyalty, which in turn requires reference to the Oregon Rules of Professional Conduct. Standing alone, "[c]onduct violating a disciplinary rule does not give rise to a private cause of action or a defense to a cause of action." *Welsh v. Case*, 180 Or. App. 370, 382 (2002). However, the Oregon Court of Appeals has held that "outside the context of disciplinary proceedings—and particularly in breach of contract and malpractice actions—disciplinary rules may define the scope of duties, including fiduciary duties, that an attorney owes to a client." *Frost v. Lotspeich*, 175 Or. App. 163, 187-88 (2001). "Disciplinary rules, together with statutes and common-law principles relating to fiduciary relationships, all help define the duty component of the fiduciary duty owed by a lawyer to their client." *Welsh*, 180 Or. App. at 382. In Oregon, Rule of Professional Conduct 1.9 provides that

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or substantially related matter in which that person's interests are materially adverse to the interests of the former client unless each affected client gives informed consent, confirmed in writing.

ORPC 1.9(a).

Consistent with ORPC 1.9(a), the Court concludes that Heffner owed a continuing fiduciary duty to LRY to refrain from representing another party in the "same or substantially related matter" when the other party's interest was materially adverse to LRY's interest, absent written consent from LRY and the new client.

The Clark Hill Defendants next challenge breach of that duty, arguing that Heffner's representation of Cornerstone and Addington did not concern the "same or substantially related matter" as his representation of LRY. Again, the Court has recourse to the Oregon Rules of Professional Conduct, which provide that matters are "substantially related" if

> (1) the lawyer's representation of the current client will injure or damage the former client in connection with the same transaction or legal dispute in which the lawyer previously represented the former client; or (2) there is a substantial risk that confidential factual information as would normally have been obtained in the prior representation of the former client would materially advance the current client's position in the subsequent matter.

ORPC 1.9(d).

In assessing whether subsequent representation concerns the same matter, Oregon courts consider whether the "core thing sought in the first matter" is "at the heart of the lawyer's representation in the second matter." *Portland Gen. Elec. Co. v. Duncan, Weinberg, Miller & Pembroke, P.C.*, 162 Or. App. 265, 283-84 (1999).

In this case, the "core" of Heffner's representation of LRY was the Lease and securing LRY's position as the operator of the Lakeview Branch.   LRY has presented evidence that Heffner, together with his junior associate Savage, prepared the Lease and represented LRY in its negotiations with the County.   Meanwhile, the "heart" of Heffner's later representation of Cornerstone and Addington was clearly the removal of LRY as the operator of the Lakeview Branch and the early termination of the Lease.   The fact that these are substantially related matters could not be more obvious.   And, as it is undisputed that Heffner did not seek or receive LRY's written consent for the subsequent representation, the Court concludes that LRY has established a breach of Heffner's duty of loyalty.

The Clark Hill Defendants challenge to Plaintiffs' showing on causation is three-fold. First, the Clark Hill Defendants argue that the record establishes that there was such dissatisfaction with LRY's performance and conduct among both LRY's clients and the County government that LRY's removal as the operator of the Lakeview Branch was inevitable, without regard to Heffner's involvement.   The record reveals, however, that one of Heffner's primary goals was to replace LRY with a new carrier owned by Addington.   After LRY had been removed, Addington expressed

reservations about taking over operations on the Lakeview Branch.  In response, the County discussed recalling LRY to resume operations, possibly under a new agreement.  This suggests that LRY's removal was not a foregone or inevitable conclusion.

Second, and relatedly, the Clark Hill Defendants argue that the decision to terminate LRY as the operator was solely in the hands of Lake County and that Lake County took this action without reference to Heffner.  In support of this argument, the Clark Hill Defendants point to the Declarations of James Bailey and Bradley Winter, who affirm that they did not rely on Heffner in terminating the Lease.  Plaintiffs have, however, produced evidence of close collaboration between Bailey and Heffner in devising the strategy and means of removing LRY and replacing it with a new carrier owned by Addington.  The record also shows that Heffner was so enmeshed with the plan to remove LRY that when Heffner was later retained to represent the County directly, his conflict disclosure letter described his new representation as a continuation of work he had already been doing for the County at Cornerstone's expense. This evidence casts doubt on Bailey and Winter's claim that Heffner's involvement was not a causative factor in the County's decision to remove LRY.

And finally, the Clark Hill Defendants contend that Heffner's involvement did not cause LRY's harm because a conflict-free attorney would have taken the same steps.  In support of this, the Clark Hill Defendants point to Bailey as an example of such a "conflict-free" attorney.  Even if the Court were to accept the "conflict-free attorney" standard for assessing causation in a case of breach of fiduciary duties, the record shows that Bailey and Heffner worked so closely together on the project of removing LRY that it is not possible, on this record, to fully disentangle their actions.  Bailey consulted and strategized with Heffner and the record suggests that Bailey was relying, possibly to a substantial extent, on advice he received from Heffner.  Bailey was also

aware of Heffner's prior representation of LRY, not least because Heffner's name appears in the Lease itself and because Heffner consulted with Bailey about whether Heffner's representation of Cornerstone was a conflict of interest. Bailey's utility as a "conflict-free" comparator is therefore dubious, at best.

Nevertheless, the Court concludes that there are genuine issues of material fact with regard to causation, which preclude summary judgment in favor of either Plaintiffs or the Clark Hill Defendants on the issue of Heffner's breach of his fiduciary duty of loyalty.

### B. Fiduciary Duty of Confidentiality

Plaintiffs allege that Heffner owed LRY a fiduciary duty of confidentiality, which obliged him to maintain the secrecy of any confidential information he learned about LRY in the course of his representation and not to use that information to the detriment of LRY. Plaintiffs allege that Heffner acquired confidential information about LRY and that he later used that information to advance Cornerstone and Addington's interests to the detriment of LRY. The Clark Hill Defendants move for summary judgment as to Plaintiffs' claim for breach of the fiduciary duty of confidentiality.

As with the fiduciary duty of loyalty, the "party claiming a breach of fiduciary duty must plead and prove the breach, and must show that the breach caused an identifiable loss or resulted in injury to the party." *Lindland v. United Bus. Invs., Inc.*, 298 Or. 318, 327 (1984). As previously noted, the Oregon Rules of Professional Conduct provide guidance in determining the scope of an attorney's fiduciary duties. ORPC 1.6 provides that a lawyer "shall not reveal information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation," or if the disclosure is expressly permitted in one of several presently-inapplicable circumstances. ORPC 1.6(a). Oregon statutory law likewise

provides that attorneys must "[m]aintain the confidences and secrets of the attorney's clients consistent with the rules of professional conduct[.]"  ORS 9.460(3).

The Clark Hill Defendants assert that there is no evidence that Heffner possessed any confidential information about LRY, or at least any *current* confidential information, when he began representing Cornerstone and Addington.  The Clark Hill Defendants also contend that there is no evidence that Heffner used any such confidential information in the course of that representation.

Plaintiffs have offered the Third Declaration of Paul Didelius, ECF No. 337, in which Didelius affirms that he conveyed confidential information about LRY's finances to Heffner during Heffner's representation of LRY and that Heffner used that information to guide his negotiations with the County on behalf of LRY.  Third Didelius Decl. ¶¶ 2-4.  James Savage confirmed that he also received confidential information about LRY during the negotiation of the Lease and that this information was copied to Heffner and included in Heffner's paper file on the LRY case.  Second Savage Decl. ¶¶ 2-3.  Plaintiffs contend that Heffner later used this information about LRY's financial situation to guide Cornerstone's strategy in pushing for the removal of LRY as the operator of the Lakeview Branch.

The Court accepts that Heffner at some point possessed confidential information about LRY, although it seems likely that whatever information Heffner possessed about LRY's finances at the time of the Lease would have been stale by the time Heffner was hired by Cornerstone and Addington.  The Court also notes that LRY made no secret of its precarious financial position in its negotiations with the County and with its own shipping clients, which raises the question of whether Heffner's information about LRY's financial situation crossed into the realm of "general knowledge."  That issue must await resolution by the trier of fact, however.  Whether Heffner used

any confidential information about LRY in the course of representing Cornerstone and Addington, and whether the use of that information was the cause of Plaintiffs' harm likewise represent genuine questions of material fact, which preclude a grant of summary judgment.

### C.  Legal Malpractice

The Clark Hill Defendants and Plaintiffs both move for summary judgment on Plaintiffs' claim for legal malpractice.  To prove a claim for legal malpractice, "as in other tort actions in which there is a special relationship between the plaintiff and the defendant," the plaintiff must show (1) a duty that runs from the defendant to the plaintiff; (2) a breach of that duty; (3) a resulting harm to the plaintiff measurable in damages; and (4) "causation, *i.e.*, a causal link between the breach of duty and the harm." *Stevens v. Bispham*, 316 Or. 221, 227 (1993).

The Clark Hill Defendants assert that any duty of care Heffner owed to LRY ended when his representation of LRY was complete and that Heffner owed no further duty of care to LRY. The Ninth Circuit has held however, that there is "in the common law a continuing duty owed by attorneys to former clients not to represent an interest adverse to a former client on a matter substantially related to the matter of engagement" and that "[w]hen such a duty is breached, the former client may bring a cause of action at law." *Damon v. Herzog*, 67 F.3d 211, 213 (9th Cir. 1995).  The Ninth Circuit found it was "nonsensical to hold that the attorney-client relationship does not remain intact with respect to matters substantially related to the initial matter of engagement" and that such a result would be "contrary to the basic tenets of attorney-client relationships." *Id.* at 214.  Although, as the Clark Hill Defendants point out, *Damon* involved a claim for malpractice under Idaho law, the Ninth Circuit's conclusion that the attorney-client relationship continues for substantially related matters was rooted in the common law and so it is readily applicable to a claim for malpractice under Oregon law.  Consistent with *Damon*, the Court

concludes that Heffner owed LRY a continuing duty of care with respect to matters substantially related to his representation of LRY, which would encompass the Lease.

The Court likewise concludes, based on the record, that Heffner's subsequent representation of Cornerstone and Addington in seeking to break the Lease and remove LRY as the operator of the Lakeview Branch constituted a breach of that continuing duty because the matters were "substantially related."  For the reasons discussed in the previous sections, however, the Court concludes that there are genuine issues of material fact remaining with respect to causation.  The claim is not, therefore, proper for resolution on summary judgment.

### D.  The "Interference" Claims

Plaintiffs' various claims for tortious and intentional interference each require a showing of causation, in addition to the other elements of each claim.  *Uptown Heights Assocs. Ltd. P'ship v. Seafirst Corp.*, 320 Or. 638, 651 (1995); *McGanty v. Staudenraus*, 321 Or. 532, 535 (1995).  The Clark Hill Defendants challenge Plaintiffs' showing of causation for these claims on essentially the same grounds as their challenge to Plaintiffs' claims for breach of the fiduciary duty of loyalty and legal malpractice.  In essence, the Clark Hill Defendants argue that LRY's termination as the operator of the Lakeview Branch was inevitable by virtue of its poor performance and contentious relationship with the County and that nothing the Clark Hill Defendants did had any effect on the outcome.  As discussed in the preceding sections, the question of causation is rife with genuine issues of material fact and must await resolution by the trier of fact.  The Clark Hill Defendants are not, therefore, entitled to summary judgment on these claims.

### E.  Breach of Contract

Plaintiffs' sixteenth claim for relief alleges breach of contract against the Estate.  Plaintiffs allege that Heffner "impliedly promised to uphold his fiduciary duties of loyalty and

confidentiality and not to take any actions that would undermine or harm LRY's exclusive Lease," and "to not undermine LRY's operations of the Lakeview Branch pursuant to the Lease and STB authority." FAC ¶ 180. Plaintiffs allege that Heffner breached this implied promise in the course of his subsequent representation of Cornerstone, Addington, and Lake County and that the breach was to Plaintiffs' detriment. *Id.* at ¶¶ 181-183.

The Clark Hill Defendants move for summary judgment on the basis that Plaintiff has not established the existence of an implied contract as alleged in the FAC, apart from Heffner's ordinary fiduciary and ethical duties as an attorney. The Clark Hill Defendants point out that Plaintiffs have not produced evidence of such an agreement and, as Heffner is now deceased, he cannot be questioned about the existence of any implied contract. Plaintiffs have not responded to the Clark Hill Defendants' motion on this point.

The elements of a claim for breach of contract are set forth in the previous sections. And although Plaintiffs have not responded to this portion of the Clark Hill Defendants' motion, "[a] district court may not grant a motion for summary judgment simply because the nonmoving party does not file opposing material[.]" *Brydges v. Lewis*, 18 F.3d 651, 652 (9th Cir. 1994).

In this case, the record is sufficient to establish that an agreement of some kind existed between LRY and Heffner concerning the provision of legal services in the formulation of the Lease. And the terms of that agreement clearly involved some continuing obligations as evidenced by the Lease's directions that Heffner's law office be contacted as counsel for LRY. And, as an attorney, Heffner obviously bears certain continuing obligations to his clients.

But there is no evidence of a separate express or implied contract between Heffner and LRY concerning maintenance of his fiduciary duties to LRY or refraining from undermining LRY's interests, nor is there evidence of the terms of such a contract. The Court therefore

concludes that the Clark Hill Defendants are entitled to summary judgment as to Plaintiff's claim for breach of contract and that claim is dismissed.

### F. Vicarious Liability

Plaintiffs contend that Clark Hill is vicariously liable for Heffner's breach of fiduciary duties, intentional interference, and legal malpractice. Clark Hill moves for summary judgment on these claims on the basis that they must stand or fall with the claims against the Estate, which the Clark Hill Defendants assert are defective. As discussed in the preceding sections, the Court has denied summary judgment on those claims and so the question of Clark Hill's vicarious liability must likewise await resolution by the trier of fact.

### G. Negligent Supervision

Plaintiffs contend that Clark Hill was negligent in its supervision of Heffner. A claim for negligent supervision requires a plaintiff to plead and prove that the employer knew or should have known of a foreseeable risk that the employee, if inadequately supervised, would engage in the type of conduct that ultimately harmed the plaintiff. *Pearson v. Reynolds Sch. Dist. No. 7*, 998 F. Supp. 2d 1004, 1029 (D. Or. 2014). As with Plaintiffs' claims for breach of fiduciary duties, legal malpractice, and tortious interference, the Clark Hill Defendants challenge Plaintiffs' showing of causation on the same grounds as previously discussed. And, for the same reasons, the Court concludes that there are genuine issues of material fact remaining with respect to causation. Summary judgment is therefore inappropriate at this juncture.

### H. Punitive Damages

Plaintiffs seek punitive damages in connection with their claims against the Clark Hill Defendants. Heffner has passed away and Plaintiffs concede that they cannot maintain a claim for

punitive damages against the Estate. *See Pearson v. Galvin*, 253 Or. 331, 339 (1969). Plaintiffs claim for punitive damages against the Estate is therefore dismissed.

The Clark Hill Defendants assert that Plaintiffs cannot maintain a claim for punitive damages against Clark Hill because the only direct claim against the firm is one for negligent misrepresentation and all of Plaintiffs' other claims against the firm are for vicarious liability based on Heffner's conduct. As Heffner is now deceased, the Clark Hill Defendants argue that a claim for punitive damages against the firm would amount to vicarious punishment. However, Oregon law permits an employer to be held vicariously liable for punitive damages, even absent evidence of fault on the part of the employer. *Johannesen v. Salem Hosp.*, 336 Or. 211, 219 (2003); *see also Stroud v. Denny's Restaurant, Inc.*, 271 Or. 430, 435 (1975) ("[I]f the servant has committed a tort within the scope of his employment so as to render the corporation liable for compensatory damages, and if the servant's act is such as to render him liable for punitive damages, then the corporation is likewise liable for punitive damages."). The Court therefore declines to dismiss Plaintiffs' claim for punitive damages against Clark Hill at this stage of the case.

### III.    Cornerstone and Addington's Motion for Partial Summary Judgment

Cornerstone and Addington have asserted cross-claims for legal malpractice and breach of the fiduciary duty of loyalty against the Estate. Cornerstone and Addington initially moved for partial summary judgment as to liability on both claims, but have subsequently confined their motion to the issue of liability on Cornerstone's claim for legal malpractice.

As discussed in the previous section, to prove a claim for legal malpractice, the plaintiff must show (1) a duty that runs from the defendant to the plaintiff; (2) a breach of that duty; (3) a resulting harm to the plaintiff measurable in damages; and (4) a causal link between the breach of duty and the harm. *Stevens*, 316 Or. at 227.

In this case, there is no question that Heffner owed a duty to Cornerstone by virtue of the attorney-client relationship.[3] Cornerstone contends that Heffner breached that duty by undertaking to represent it on a matter substantially related to his prior representation of LRY and in which Cornerstone's interests were materially adverse to the interests of LRY, without first obtaining the written consent of both Cornerstone and LRY.  Cornerstone contends that Heffner's failure to secure written consent from LRY for his subsequent representation of Cornerstone was the cause of its damages because at least some of LRY's claims against Cornerstone are based on Cornerstone's use of Heffner as its attorney.  The Court concludes, however, that there are substantial questions of material fact remaining with respect to causation, which render this claim unsuited for summary judgment.  Accordingly, the Court need not consider Cornerstone's showing on the other elements and Cornerstone's motion is denied.

## CONCLUSION

Lake County's Motion for Partial Summary Judgment against Plaintiffs, ECF No. 239, is DENIED.

Plaintiffs' Motion for Partial Summary Judgment against Lake County, ECF No. 222, is GRANTED.  As set forth above, the Court concludes that Paragraph 13.05 of the Lease is a liquidated damages clause, but that it is void as unlawful.  The Court further concludes that Plaintiffs are entitled to summary judgment as to liability for their claim for breach of contract against Lake County.

Plaintiffs' Motion for Partial Summary Judgment as to the Clark Hill Defendants, ECF No. 232, is DENIED.

---

[3] There is a disputed question of fact as to whether Heffner also represented Addington and, for purposes of this motion, the Court will assume that Heffner only represented Cornerstone.

The Clark Hill Defendants' Motion for Summary Judgment, ECF No. 329, is GRANTED in part and DENIED in part. Plaintiffs' claim for punitive damages against the Estate is DISMISSED. Plaintiffs' claim for breach of contract against the Estate is DISMISSED. The Clark Hill Defendants' Motion is DENIED as to all other claims.

Cornerstone and Addington's Motion for Partial Summary Judgment, ECF No. 187, is DENIED.

It is so ORDERED and DATED this <u>  27th  </u> day of October 2021.

<u>  s/Michael J. McShane                   </u>
MICHAEL McSHANE
United States District Judge